UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 24 CR 503 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| MARQUELL DAVIS | ) | District Judge |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On November 3, 2022, defendant Marquell Davis and his co-defendants carjacked two innocent Chicagoans at gunpoint. Each crime was violent and reckless. In the first carjacking, defendant jammed his gun so hard into his victim's back that he left a bruise. In the second carjacking, the victim, a doctor at Northwestern who had polio as a child, used his crutches to scramble away as defendant pointed a gun at him and fell to the ground in fear. Then, as his co-defendants approached trial, defendant authored a false affidavit in return for money in which he provided a false alibi for his co-defendant, Edmund Singleton.

Despite his guilty plea, defendant has clearly not accepted responsibility for his actions, and no sentence will repair the pain and trauma defendant has inflicted upon his victims. Given defendant's conduct and obstruction of justice, the Guidelines range has increased substantially. The government recommends a sentence at the low end of the Guidelines range. The government recognizes this is a significant sentence, but given defendant's extreme violence, his dangerousness, and his post-plea attempts to subvert the judicial process, this sentence is warranted.

1

I.  **BACKGROUND**

On October 24, 2024, defendant was charged in an indictment with conspiracy to commit a carjacking and armed robbery, in violation of Title 18, United States Code, Section 371 (Count One); carjacking and attempted carjacking, in violation of Title 18, United States Code, Section 2119 (Counts Two and Four); and using a gun in furtherance of a crime of violence, in violation of Title 18, United States Code, Section 924(c) (Count Three). Dkt. 16. On June 5, 2025, defendant pleaded guilty to Counts Two, Three, and Four of the indictment pursuant to a plea declaration. Dkt. 83. Defendant is scheduled to be sentenced by this Court on September 30, 2025, at 1 p.m. Dkt. 172.

II.  **ADVISORY GUIDELINES CALCULATION**

Count Three requires a mandatory minimum sentence of 7 years because defendant brandished his firearm during the armed robbery he committed.

As to Counts Two and Four, the Probation Office has calculated defendant's offense level as 35, based upon the two carjackings, and enhancements for committing a carjacking, obstructing justice, recklessly endangerment during flight, attacking a vulnerable victim, and inflicting injury upon one of his victims. Supp. PSR at ¶¶ 2-32. The government agrees with the Probation Office's offense level calculation.

The facts of defendant's crime support the enhancements. Defendant and his co-defendants fled from police, at times at high speed, in the Jeep SRT used to commit the carjackings. They then fled on foot with guns and hid in residential backyards as police encircled them. As shown on the helicopter video at trial, defendant leaped over fences, running from police as they closed in. Defendant then hid his gun in a garbage

can in a residential backyard where it could have been picked up by a child or discharged when a sanitation worker collected the garbage. Based on these facts, the reckless endangerment enhancement under § 3C1.2 applies. *See United States v. Chandler*, 12 F.3d 1427, 1433 (7th Cir. 1994) (upholding enhancement where defendant led officers on high-speed chase); *United States v. Rogers*, 423 F. App'x 636, 640 (7th Cir. 2011) (defendant "discarded a loaded revolver in a residential neighborhood at night, creating a substantial risk that someone would find it and get hurt. Thus, it would be frivolous to challenge the § 3C1.2 adjustment.").

The vulnerable victim enhancement is also appropriate because, as demonstrated through surveillance video at trial, during the second carjacking, defendants paused for at least 40 seconds in their Jeep SRT in good position to observe their victim slowly exit his vehicle using crutches. Defendants then circled back and carjacked the doctor. *See* Ex. A. As the Court was able to observe at trial, Victim B's history of polio and use of crutches made him more vulnerable to attack such that the enhancement is warranted. *See United States v. White*, 903 F.2d 457, 463 (7th Cir. 1990) (applying enhancement to armed robbery victim in his 60's with respiratory problems because it was logical that defendant targeted victim "having observed his advance age" that "rendered him unable to resist and flee").

The obstruction of justice enhancement is also appropriate. Shortly before trial, defendant authored a false affidavit in which he claimed that co-defendant Edmund Singleton was not with him during the carjackings. Jail calls and emails show that Singleton's girlfriend paid defendant $50 in return for the affidavit, and

3

evidence at trial, in particular call records and DNA, proved that Singleton was in the Jeep SRT when the carjackings were committed. *See United States v. Gonzalez-Mendoza*, 584 F.3d 726, 730 (7th Cir. 2009) (upholding obstruction affidavit where defendant committed perjury in false affidavit).

The government also agrees that defendant's obstruction of justice before trial results in a loss of any downward offense level adjustment for acceptance of responsibility. *See United States v. Davis*, 442 F.3d 1003, 1009–10 (7th Cir. 2006) ("A defendant whose sentence was properly enhanced for obstruction of justice is presumed not to have accepted responsibility.")

The government agrees with the Probation Office's determination that defendant has a criminal history category of I. PSR ¶ 56. As a result, defendant has a final offense level of 35, resulting in a sentencing guideline range of 252 to 294 months' incarceration, which includes the mandatory 84 months pursuant to Count Three. Supp. PSR ¶ 36. The Probation Office has recommended a sentence of 192 months.

### III. THE 3553(A) FACTORS WARRANT A SIGNIFICANT SENTENCE WITHIN THE GUIDELINES RANGE

The Sentencing Guidelines provide an initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). The Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. The Guidelines thus "remain an essential tool in creating a fair and uniform sentencing regime across the country." *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005); *see also United States v. Pulley*,

4

601 F.3d 660, 668 (7th Cir. 2010) (a "district court that sentences within the Guidelines necessarily gives weight and consideration to avoiding unwarranted disparities."). The ultimate goals of the Guidelines are "uniformity and proportionality." *Rita v. United States*, 551 U.S. 338, 349 (2007). Although a sentence within the Guidelines is presumptively reasonable, *United States v. Cano-Rodriguez*, 552 F.3d 637, 639 (7th Cir. 2009), the court must consider the factors set forth in 18 U.S.C. § 3553(a).

Here, the Guidelines range is high, especially for a defendant with no criminal history. But the range reflects not only the extremely violent crimes defendant committed in 2022, but also defendant's brazen attempt to undermine the trial of his co-defendants by lying in a sworn affidavit. A significant sentence is needed to protect society and deter defendant and others from committing similar offenses.

### A. The Nature and Circumstances of the Offense

On November 3, 2022, defendant and his co-defendants made a plan to carjack and rob at gunpoint innocent people throughout Chicago. They acquired guns and gun accessories, masks, and a stolen Jeep SRT that they used to commit the carjackings. They then hunted for victims, driving near gas stations and searching for cars they liked and unsuspecting victims. When they found their victims, defendant and his co-defendants burst out of the SRT with guns drawn, made threats, and quickly attempted to steal the victims' cars. Surveillance video shows that defendant was the most aggressive and violent of his co-defendants.

The first victim they found was Victim A. Victim A was pumping gas on the

south side of Chicago, minding his own business. As shown on surveillance and through Victim A's testimony at trial, defendants slowed their Jeep SRT, observed Victim A pumping gas in front of his Infiniti, and circled back to commit the carjacking. Defendant was the first out of the SRT. Defendant quickly ran up to Victim A and jammed a snakeskin gun into Victim A's back. Victim A testified at trial that force of the gun was so great that it left bruising. Below is a screenshot of defendant pressing the gun into Victim A's back:



Defendant then forced Victim A to the ground at gunpoint and took his car keys. Victim A scrambled away on the ground in terror. Victim A testified that he was afraid that defendant was going to shoot him in the face and told Probation that

6

the whole experience was "traumatizing." As he stood up to get further away, defendant, who was already in Victim A's Infiniti and had no reason to threaten Victim A further, pointed his gun at Victim A, causing Victim A to jump in fear. Below is a screenshot of defendant pointing the snakeskin gun at Victim A from the front seat of the Infiniti:



But one carjacking was not enough. A few hours later, defendant and his co-defendants used the SRT to commit another carjacking. This time, they carjacked Victim B, a Northwestern doctor who had polio as a child and who, as a result, walks slowly with crutches. Surveillance video showed the Jeep SRT slowing and pausing for several seconds as Victim B exited his vehicle with crutches. *See* Ex. A. Below is a screenshot of the Jeep SRT paused at an intersection as Victim B exited his vehicle. Defendant was seated in the rear driver's side seat and thus would have had a clear view of Victim B from the SRT. The SRT paused at the intersection for at least 40 seconds, despite having a green light for a portion of that time. *Id.*



Similar to the first carjacking, defendants then used the SRT to box in their victim. Defendant and his co-defendant, Ramone Bradley, exited the SRT and they both pointed guns at Victim B as he collapsed to the ground in fear. Defendant did not abort the carjacking when he saw that Victim B used crutches, instead, defendant stole his keys and wallet at gunpoint and with Bradley, tried to drive away in Victim B's BMW. Defendant and Bradley only gave up on the carjacking once they were unable to operate Victim B's specially designed car.

Defendant's dangerous behavior did not end with the carjacking of Victim B. Shortly after the carjacking, a police officer spotted the SRT. Defendants fled from that police officer and then led police helicopters on a 20-minute chase, at times traveling at high-speed and using evasive driving techniques. As police officers on the ground closed in, defendants abandoned the SRT and fled on foot while armed with guns. As shown on surveillance video and body worn camera footage, and as established at trial, defendants ran through the backyards of residential homes and discarded their guns as police closed in. Defendant discarded his unique snakeskin

8

gun in a garbage can in the backyard of a residence. Below are screenshots of the backyard in which defendant discarded his gun (with the trash can circled) and the gun inside the trash can:





In addition to the surveillance video showing defendant jamming the snakeskin gun into Victim A's back, pictures and videos recovered through search

9

warrants showed defendant consistently brandishing that gun and others in the days and weeks before he committed these carjackings. Below are two pictures. The first is a picture of defendant with a face mask and three guns, including a gun with a laser sight and the snakeskin gun, from a few days before the carjackings. The second is a screenshot of defendant with a facemask on, holding the snakeskin gun while in the passenger seat of the SRT with Singleton driving, from a video taken a week before the carjackings:




These pictures, and the other pictures shown at trial, demonstrate that while defendant does not have a criminal history, the carjackings were not his first time carrying a gun. As documented at trial, guns with extended magazines and machinegun conversion switches were a way of life for defendant and his co-

10

defendants. Defendant was riding around in stolen cars with masks and loaded guns for days leading up to the carjackings, and the crimes of November 3, 2022, were merely the culmination of repeated dangerous conduct.

Defendant's crimes were serious, violent, and showed a complete disregard for human life. As horrible as gang shootings or bank robberies are, carjackings are uniquely personal. The victims are all innocent—driving home from work, dropping off a co-worker, getting ready to watch a football game—and their cars were invaded by men with loaded guns threatening to kill them. The victims testified that they feared for their lives and truly believed defendant would shoot them if they resisted. And it is not hard to imagine someone getting killed during these reckless crimes. Defendant's gun was loaded with a live round in the chamber. What would have happened had a victim or bystander pulled out a legal gun to defend themselves?

Defendant's punishment must reflect the grave seriousness of his crimes, the trauma he inflicted upon several innocent people, and the danger and violence he caused. A sentence at the bottom of the Guidelines range is appropriate given the scope and seriousness of his crimes.

### B. Obstruction of Justice

On July 7, 2025, two weeks before trial, Edmund Singleton filed a motion seeking to admit a notarized affidavit signed by defendant, in which defendant attempted to provide an alibi for Singleton. The affidavit was dated June 9, 2025—just four days after defendant pled guilty. A screenshot of the body of the affidavit is below:

11



Dkt. 106-2.

After receiving notice of the affidavit, the government obtained jail calls, jail emails, and jail account payment records from the Metropolitan Correctional Center for defendant and Singleton, which showed that Singleton had instructed his girlfriend to put money in defendant's inmate trust account in exchange for defendant signing the false affidavit. Below is a summary of emails between Singleton and his girlfriend Destiny Lyles on June 8 and June 9 (attached as an Exhibit to the government's version of the offense).[1]

- 6/8/2025 (the day before the affidavit was notarized): Singleton wrote, "aye wifey could you put 50 on his book's for me please and thank you."
- 6/8/2025: Lyles responded, "if he really gonna do it then yea."
- 6/9/2025: Singleton wrote, "I'm waiting on you to send it . . . I told you that he got that shit tooking [sic] care of ass well now we just wait till tomorrow to get the copy's made wifey bae I'm [sic] really think that this shit is gone work out

---

[1] At trial, the government introduced a video in which Singleton identified Lyles as his girlfriend.

for us."
- 6/9/2025: Lyles responded, "okay well ima send the money in a bit."
- 6/9/2025: Singleton wrote, "thanks for sending me the money and lilbro" [In Singleton's phone, defendant's phone number was saved with the contact name "Lilbro Smokey."]
- 6/9/2025: Singleton wrote, "well we at the end of this shit and it's time to get this shit over with soo your man could get tf outa here frfr"
- 6/9/2025: Singleton wrote, "okay thank you and yess tell him that lilbro did his part on the thing and we just gotta wait till tomorrow to make the copy's to it then we good from there stank and yess its about to be over with real soon."
- 6/10/2025: Singleton wrote, "now we just gotta see how this shit play out at court but everybody that on are deck that be doing the law work says that we should be super good and they should dismiss the shit on me now fasho."
- 6/11/2025: Singleton wrote, "we have this shit all the way beat fasho fasho and he still talking good on that are behave [sic] if he haves to come to court and tell the judge hisself bao soo we gone be good tho I have a real good feeling about this shit gone work out for us bae cause we aint never came this close how we are now with what he did."

On June 9, 2025, the same date the affidavit was notarized and the same date that Singleton wrote "thanks for sending me the money and lilbro," Destiny Lyles sent defendant $50 to his jail account. Below is a screenshot of defendant's payment records from the MCC.

| Date: 07/17/2025 Time: 05:57 PM | | | Federal Bureau of Prisons TRUVIEW Inmate Center Report Sensitive But Unclassified | | | | | Location: DC | |
|---|---|---|---|---|---|---|---|---|---|
| Reg #: 44073511 | | Start Date: 6/9/2025 | | End Date: 6/16/2025 | | | | | |
| ☑ Money Received ☐ Email List | | ☑ Money Sent ☐ Messages | | ☐ Contact List ☐ Visitor List | ☐ Addresses ☐ Visits | ☐ Phone List ☐ Timeline | | ☐ Calls | |
| **Money Received** | | | | | | | | | |
| Transaction Date | Loc | Trans Type | Amount | Sender Nm | Address | City | St | Zip | Phone |
| 6/11/2025 8:06:12 PM | CCC | Money Gram | $40.00 | DAVIS, MAKELA | 7736 S PEORIA ST | CHICAGO | IL | 60620 | 7737389388 |
| 6/9/2025 6:06:47 PM | CCC | Western Union | $50.00 | LYLES, DESTINY | 7946 S NORMAL | CHICAGO | IL | 60620 | 3129983271 |

Jail calls from June 8 and June 9 between Singleton and Lyles also confirm that Singleton arranged for Lyles to pay defendant $50 to sign the alibi affidavit for Singleton. At trial, the government presented substantial evidence that defendant's

13

alibi affidavit was false, and that Singleton was in the Jeep SRT and had his own phones during the carjackings, including:

- Singleton was arrested running from the Jeep SRT and had two of his phones in his possession when he was arrested.
- Those phones' location data showed they were at the scenes of the carjackings.
- Call records from one of the phones recovered from Singleton show that he made outgoing calls and text messages during the carjacking spree, including multiple long calls with Destiny Lyles and multiple calls to defendant.
- Singleton's phone had a passcode that needed to be entered to make calls or send messages.
- Singleton's DNA was on the steering wheel of the Jeep SRT.

Defendant's false affidavit not only warrants the enhancement for obstruction, but it also demonstrates a lack of respect for the judicial process and indicates that he is not truly accepting responsibility and trying to lead a law-abiding life. This unwillingness to truly accept responsibility is also captured by defendant's plea declaration. In his declaration, he refused to name his fellow carjackers or ascribe any actions to them. Dkt. 84 at 3-4. He also attempted to minimize his role in the offense by claiming he did not observe Victim B's crutches before carjacking him and that he did not point a gun at Victim B. *Id.* Given that defendant authored his false affidavit only four days after his plea declaration, it is likely that he crafted his narrow plea declaration as part of a plan to plead guilty in a limited fashion while still helping Singleton escape liability for the carjackings in return for a cash payment. This is aggravating.

### C. Defendant's History and Characteristics

Defendant is 23 years old and has lived in the Chicago area for most of his life. PSR ¶ 64. He grew up with a good relationship with his mother and grandmother,

although his mother struggled with drug addiction. PSR ¶¶ 66-67. Defendant was raised in a low-income family, and his grandmother struggled to provide for him. PSR ¶ 68. He also grew up in a tough neighborhood and was exposed to significant violence and the untimely deaths of many family members, including his brother, his mother, and his brother's best friend. PSR ¶ 71. Defendant suffered from PTSD after witnessing his brother's best friend's murder in 2019. PSR ¶ 85. Defendant graduated high school in 2020, and he also received certifications for carpentry in high school. PSR ¶¶ 98-99.

Although defendant's history is largely mitigating, it is troubling that defendant has chosen to re-inflict the trauma he experienced on others by committing violent crimes. It is also troubling that defendant's first criminal conviction related to such a violent, dangerous crime. In defendant's favor, however, is his youth and his complete lack of criminal history prior to this crime. It is extremely rare for a federal criminal defendant to have no history of arrests or convictions, and the fact that defendant is young and lived a mostly law-abiding life prior to his arrest provides hope that he can return from prison and be a productive member of society.

While a significant sentence is necessary to ensure that defendant ages out of the extremely bad decision-making he displayed during the carjackings, his age and lack of criminal history warrant a sentence at the bottom of the Guidelines range.

### D. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment and Deterrence

Defendant's crimes terrorized innocent Chicagoans and showed a complete disregard for human life, for societal norms, and for the law. A significant sentence

15

within the Guidelines range will appropriately punish him for the harm he has caused, it will provide some measure of justice for those he victimized, it will protect society of future crimes, and it will deter him from continuing to offend.

General deterrence is also a factor in this case. While the murder rate in Chicago has declined in recent years, carjackings, many committed by unrepentant carjackers like defendant, have spiked, doubling from 2018 to 2023.[2] These violent carjackings are committed by a relatively small number of people, but they have a huge impact on the citizens of the Northern District as a whole. As reflected by the victim testimony, these crimes cause significant trauma, and they are uniquely personal. Carjackings like those here not only leave the victims scarred and perhaps looking for new places to live, but they impact the sense of safety and security for all Chicagoans. Only a significant Guidelines sentence will deter defendant and others like him who would terrorize innocent Chicagoans without remorse.

## IV. RECOMMENDED CONDITIONS OF SUPERVISED RELEASE

Given the circumstances of the offense, defendant's youth, and all the factors set forth in Title 18, United States Code, Section 3553(a), the government recommends that the Court impose a period of supervised release of five years. Even with a significant sentence, defendant will be relatively young upon his release. He should be supervised for a significant period of time to ensure his continued compliance with the law.

---

[2] *See* Illinois Policy Institute, *Carjackings More Than Double from 5 Years Ago*, December 5, 2023, *available at* https://www.illinoispolicy.org/carjackings-more-than-double-in-chicago-from-5-years-ago/.

The mandatory, discretionary, and special conditions of supervised release under 18 U.S.C. § 3583(d) are set forth on pages 21 through 26 of the PSR. The government agrees with the conditions proposed in the PSR and concurs with the probation officer's rationale for these conditions. Specifically, the government agrees that discretionary conditions (4), (6), (8), and special condition (3) promote the statutory factors of affording adequate deterrence to criminal conduct, protecting the public from further crimes by the defendant, and assisting the defendant in reintegrating into society upon his release. Providing defendant with adequate educational and job training will help him achieve employment, which will be crucial in helping prevent recidivism. The government further agrees that discretionary conditions (7), (9), (14), (15), (16), (17), and (18) and special conditions (5), (6), (7), and (11) promote the statutory factor of allowing for effective monitoring of defendant during any supervised release term imposed. Discretionary condition (24), which Probation did not propose, is also appropriate in this case to ensure that defendant is not illegally possessing firearms after he is released.

## V. CONCLUSION

For the reasons set forth above, the government respectfully requests that this Court impose a total sentence of 252 months' imprisonment. Defendant was the most violent member of a carjacking crew that victimized two innocent people, and he attempted to subvert his co-defendants' trial with a false affidavit. His conduct, both during the offenses and before trial, warrants a significant sentence.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: _s/ Elie Zenner_
ELIE ZENNER
SIMAR KHERA
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 697-4032
